IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SARAH ADELA COY, individually, | § | |
| As Heir at law, and as Independent | § | |
| Administrator of the Estate of | § | |
| ROBERT MICHAEL COY, | § | |
| Deceased; CHRISTY LYNN | § | |
| LUNDAY; and DEBBIE LEANN | § | |
| WOLFE | § | |
| *Plaintiffs* | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:19-cv-02908 |
| | § | |
| THE COUNTY OF WALLER; | § | |
| COUNTY OF WALLER | § | |
| SHERIFF'S OFFICE; SHERIFF | § | |
| GLENN SMITH; DONNIE | § | |
| MORDECAI; ROBERT FIELDS; | § | |
| JOHN MOON; STEPHEN | § | |
| TUCKER; PATRICK CASEY; | § | |
| SHAWN DARLING; and WES | § | |
| MANION | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS'

## MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................2

INDEX OF AUTHORITIES .........................................................................3

STATEMENT OF ISSUES............................................................................6

INTRODUCTION ..........................................................................................7

FACTS .............................................................................................................8

ARGUMENT ..................................................................................................9

I.      Standard of Review.............................................................................. 10

II.     Plaintiffs have alleged a sufficient excessive force claim
        against Tucker. .................................................................................... 12

III.    Defendants' motion with respect to the other officers that
        were part of the SWAT team should also be denied. ............................ 16

IV.     Defendants' motion to dismiss with respect to Waller County
        should be denied. ................................................................................. 17

V.      The Court should agree to dismiss the Texas state law
        claims, punitive damages claims against Waller County, and
        the claims against the Sheriff's office. ................................................. 21

VI.     If this Complaint is dismissed, Plaintiffs seek leave to
        amend. .................................................................................................. 22

CONCLUSION............................................................................................ 23

CERTIFICATE OF SERVICE.................................................................... 24

APPENDIX.................................................................................................. 25

# INDEX OF AUTHORITIES

**Page**

**Cases**

*Albany Ins. Co. v. Almacenadora Somex S.A.*,
  5 F.3d 907 (5th Cir. 1993) ............................................................. 21

*Alexander v. Verizon Wireless Services, L.L.C.*,
  875 F.3d 243 (5th Cir. 2017) ............................................................. 9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................. 9

*Backe v. LeBlanc*,
  691 F.3d 645 (5th Cir. 2012) ............................................................. 10

*Betton v. Belue*,
  ___ F.3d ___ , 2019 WL 5700353 (4th Cir. Nov. 5, 2019) ............................ 13

*Byrd v. Brishke*,
  466 F.2d 6 (7th Cir. 1972) ............................................................. 15, 16

*Cox v. Kaelin*,
  577 Fed. App'x 306 (5th Cir. 2014) ............................................................. 10

*District of Columbia v. Wesby*,
  138 S. Ct. 577 (2018) ............................................................. 9

*EPCO Carbon Dioxide Products, Inc. v. JP Morgan Chase Bank, NA*,
  467 F.3d 466 (5th Cir. 2005) ............................................................. 10

*Estate of Smith v. Marasco*,
  430 F.3d 140 (3d Cir. 2005) ............................................................. 18

*Geiger v. Sloan*,
  No. 18-60480, 2019 WL 3763525 (5th Cir. Aug. 8, 2019) ....................... 12, 13

*Goodman v. Harris County*,
  571 F.3d 388 (5th Cir. 2009) ............................................................. 17

*Harris v. Chanclor,*
    537 F.2d 203 (5th Cir. 1976) .................................................................. 15

*Hart v. Bayer Corp.,*
    199 F.3d 239 (5th Cir. 2000) .................................................................. 21

*Holland ex rel. Overdorff v. Harrington,*
    268 F.3d 1179 (10th Cir. 2001) ......................................................... 9, 18

*Jensen v. City of Oxnard,*
    145 F.3d 1078 (9th Cir. 1998) ................................................................ 19

*Johnson v. Johnson,*
    385 F.3d 503 (2004) .............................................................................. 10

*Mace v. City of Palestine,*
    333 F.3d 621 (5th Cir. 2003) .................................................................. 12

*O'Neill v. Krzmeninski,*
    839 F.2d 9 (2d Cir. 1988) ....................................................................... 15

*Pineda v. City of Houston,*
    291 F.3d 325 (5th Cir. 2002) .................................................................. 17

*Piotrowski v. City of Houston,*
    237 F.3d 567 (5th Cir. 2001) .................................................................. 17

*Ramirez v. Knoulton,*
    542 F.3d 124 (5th Cir. 2008) .................................................................. 11

*Rel. Bazan v. Hidalgo County,*
    246 F.3d (5th Cir. 2001) ........................................................................ 12

*Summer v. Land & Leisure, Inc.,*
    664 F.2d 965 (5th Cir. 1981) .................................................................. 21

*Texas Dep't of Pub. Safety v. Petta,*
    44 S.W.3d 575 (Tex. 2001) .................................................................... 20

*United States v. Koon,*
    34 F.3d 1416 (9th Cir. 1994), *rev'd in part on other grounds by Koon v.*
    *United States*, 518 U.S. 81 (1996) ......................................................... 16

*Waller v. Hanlon,*
   922 F.3d 590 (5th Cir. 2019) .......................................................... 14

*Ware v. Reed,*
   709 F.2d 345 (5th Cir. 1983) .......................................................... 16

*Z.J. by & through Jones v. Kansas City Bd. of Police Commissioners,*
   931 F.3d 672 (8th Cir. 2019) .......................................................... 18

**Rules**

Federal Rule of Civil Procedure 12(b)(6) .............................................. 8

Federal Rule of Civil Procedure 15(a) ................................................. 20

## STATEMENT OF ISSUES

1.      Whether plaintiffs' claim that an officer who shoots a non-threatening resident of a home in his own bedroom while executing a search warrant against someone else's property states a claim under Rule 12?

2.      Whether plaintiffs' claim that other officers who were part of the same SWAT team can be liable under Section 1983 for their failure to prevent the shooting states a claim?

3.      Whether plaintiffs' claim that a county that has a policy of using SWAT teams in all circumstances to execute search warrants without analyzing whether they are necessary states a claim under Rule 12?

Defendants have filed a motion to dismiss in this case (ECF Doc. No. 22). Plaintiffs file this opposition to their motions to dismiss.

## INTRODUCTION

Robert Michael Coy was asleep at home at 5:30 in the morning when a Waller County SWAT team executed a "dynamic entry" into his house. They did so under a search warrant for someone else's property. During that search, Mr. Coy was killed by one of the officers in his own bedroom, asking desperately for his domestic partner to call the police. He was not the suspect of any crime, was not thought to be dangerous in any way, was not given a chance to respond appropriately to the SWAT team, and certainly was no imminent threat to anyone (much less to a SWAT team officer in heavy tactical armor). The officer who wantonly killed Mr. Coy should be liable for an unconstitutional use of excessive force under Section 1983. Certainly at this early stage, the complaint amply pleads such a case.

The claims against the other officers in the SWAT team should also be sustained because they failed to prevent an unconstitutional use of force against Mr. Coy. Courts have long recognized that a peace officer has a duty to prevent such killings when they can. These officers did not. But this lawsuit also seeks recovery against Waller County for the policies and customs that led to this senseless killing. There is no reason whatsoever that a search warrant

for a non-violent suspect for child pornography should be carried out by a SWAT team absent special circumstances, and certainly not where the suspect lives with innocent people who have nothing to do with his alleged crimes. As pleaded (and as plaintiffs are confident they will prove) Waller County's policy of using a SWAT team in these circumstances violates the Constitution.

This is an important case. It strikes at some of the most important freedoms Americans have—the right to be safe in one's own home, asleep in one's own bed. To grant qualified immunity in these circumstances—without discovery, without any camera footage, and without any testimony—would be to give police departments sanction to use lethal force against innocent homeowners and residents with reckless disregard. Defendants' motion to dismiss should be denied in most respects.

## FACTS

The facts as we know them now are straightforward. Mr. Coy was asleep at home on July 18, 2018. Compl. ¶ 19. The Waller County Police acquired a search warrant for devices that might contain child pornography owned by Mr. Coy's girlfriend's son. Compl. ¶ 19. Mr. Coy was not listed in that warrant as the person who might have such a device, and he was not suspected of any crime. Compl. ¶ 19. A Waller County SWAT team, fully armed and armored, burst into his house at 5:30 AM and shot him during its raid. Compl. ¶20. We

believe the person who fired the fatal bullet was Deputy Stephen Tucker. The Complaint alleges that Mr. Coy, far from being a threat to any police officer, actually told his girlfriend to *call* the police in response to the home invasion. Compl. ¶ 19-22. The Complaint also alleges that Waller County and its Sheriff have a policy under which SWAT teams are systematically used to execute even routine warrants against non-dangerous suspects. Compl. ¶ 28-32.

## ARGUMENT

This Court should deny Defendants' motion to dismiss in nearly every respect. First, the Complaint alleges a straightforward excessive force claim against Stephen Tucker, the officer whom plaintiffs believe shot and killed Mr. Coy.[1] The killing of a person who may have been unarmed and in any event was not a threat to the SWAT team is a paradigmatic excessive force claim. The other members of the SWAT team are also liable for failing to prevent Tucker's use of excessive force. Finally, Waller County is liable because it created a custom or policy of using SWAT teams against non-violent offenders without engaging in any analysis as to whether that use is reasonable. But the "decision to deploy a SWAT team to employ a warrant necessarily involves the decision to make an overwhelming show of force—force far greater than that

---

[1] Defendants do not appear to dispute that Mr. Tucker shot Mr. Coy.

normally applied in police encounters with citizens." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1189 (10th Cir. 2001). To fail to even consider whether that overwhelming force is justified violates the law.

## I.     Standard of Review

A motion to dismiss may only be granted under Federal Rule of Civil Procedure 12(b)(6) if the complaint does not contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In evaluating the complaint, the Court must ask whether it can reasonably infer "more than the mere possibility of misconduct." *Id.*

Section 1983 provides a cause of action to an individual harmed by a state official's violation of federal law. Under Supreme Court precedent, government officials are entitled to qualified immunity when carrying out their duties. Plaintiffs can overcome that immunity by showing that the officer violated their clearly established right. "Clearly established" means that either a "controlling authority" explicitly adopts a rule or else there is a robust consensus of persuasive authority. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018).

Nonetheless, qualified immunity can only be granted on a motion to dismiss where the defense is established on the face of the complaint. *See Alexander v. Verizon Wireless Services, L.L.C.*, 875 F.3d 243, 249 (5th Cir.

2017). So long as factual circumstances supporting liability are not "foreclosed" by the "face" of plaintiff's pleading, "dismissal at this early stage" is improper. *EPCO Carbon Dioxide Products, Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466 (5th Cir. 2005).

One threshold issue. Defendants assert that the Complaint should be dismissed because it does not satisfy a "heightened" pleading requirement applicable to qualified immunity cases. *See* Mot. at 10. There is no heightened pleading standard in Section 1983 cases (or in any other kind of case outside the Rule 9 context). *See Cox v. Kaelin*, 577 Fed. App'x 306 (5th Cir. 2014) ("Kaelin's argument [that there is a heightened pleading standard when qualified immunity applies] misreads this Court's opinion in [*Schultea v. Wood*]"). Rather, the Fifth Circuit has explained that *Schultea* and the other cases that have mentioned a "heightened" standard were actually referring to the possibility of a Court requiring a "detailed Rule 7 reply" to the defendant's *answer*. When a motion to dismiss is filed, as here, "we will apply the ordinary rules that govern the sufficiency of complaints." *Johnson v. Johnson*, 385 F.3d 503, 530 (2004). *See also Backe v. LeBlanc*, 691 F.3d 645 (5th Cir. 2012). This case is governed by Rule 8(a), not by any other pleading standard.

## II. Plaintiffs have alleged a sufficient excessive force claim against Tucker.

Defendants assert that plaintiffs do not state a claim against Deputy Stephen Tucker—the SWAT team member believed to have killed Mr. Coy. Putting aside Defendants' erroneous "heightened pleading" argument, addressed above in Part I, the Complaint amply alleges excessive force under the Constitution. To be sure, Defendants are entitled to dispute that claim. Discovery will help make clear whether Mr. Coy was armed, whether he was an imminent threat to Mr. Tucker or any other police officer, and whether Mr. Tucker's actions were reasonable or not. But those are issues for a later stage of this litigation, not a motion to dismiss.

To state a claim for excessive force, a complaint must allege an injury, which resulted directly from the use of force that was clearly excessive to the need, and the excessiveness of which was objectively unreasonable. *See Pena v. City of Rio Grande City,* 879 F.2d 613 (5th Cir. 2018). In performing that analysis, the Court must determine "whether the totality of the circumstances justified" the particular use of force. *Ramirez v. Knoulton*, 542 F.3d 124 (5th Cir. 2008). This is meant to be an objective standard—the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them. *Id.* Use of deadly force in particular is not unreasonable when an officer would have reason to believe that the suspect

poses a threat of serious harm to the officer or others. *Mace v. City of Palestine*, 333 F.3d 621 (5th Cir. 2003) (granting qualified immunity on summary judgment where plaintiff "turned, and raised [a] sword toward the officers")

Such a threat, the Fifth Circuit has repeatedly held, must be *imminent*. *See also Bazan ex. Rel. Bazan v. Hidalgo County*, 246 F.3d 482 (5th Cir. 2001) (explaining that in an excessive force case whether the officer felt a "threat of serious physical harm" at the moment he fired the shot is the relevant factor to the qualified immunity inquiry); *Geiger v. Sloan*, No. 18-60480, 2019 WL 3763525 (5th Cir. Aug. 8, 2019) (unpublished) ("The officer must believe that the suspect poses a significant threat of death or serious physical injury to the officer or others … [t]hat threat must be imminent. It cannot be a past threat … the focus is on what made the officer shoot."). For good reason—the police should not shoot and kill citizens unless they are in immediate fear for their life.

The Complaint directly alleges a violation of Section 1983 against Mr. Tucker. Specifically, the Complaint alleges that (a) Mr. Coy was not believed to be dangerous by anyone, nor was anyone else in his house; (b) the police burst into his house while he was asleep and assaulted him; (c) he believed he was under attack by home intruders, and asked his girlfriend to immediately call the police; and (d) he was not threatening the police with a weapon when

he was shot. Combined, these are allegations of excessive force under Section 1983 that must survive a qualified immunity motion to dismiss.

A case decided by the Fourth Circuit just last week with startlingly similar relevant facts is instructive. In *Betton v. Belue*, ___ F.3d ___ , 2019 WL 5700353 (4th Cir. Nov. 5, 2019), a SWAT team burst into the home of a "fugitive" and "active drug dealer." He did not know they were the police, so he pulled out the gun that he kept in his waistband. *Id.* at *2. Rather than giving him a meaningful opportunity to comply with their orders, the officers shot him, leaving him permanently paralyzed. *Id.* at *3. The court held—even on a motion for summary judgment where the officers presented evidence that the gun was pointed at them—that qualified immunity did not protect the officers from liability. To the contrary, the Court held that this scenario presented "an obvious case exhibiting a violation of a core Fourth Amendment right." *Id.* (internal citations omitted). So too here.

Presumably, Defendants want to argue Mr. Tucker shot Mr. Coy because he felt an imminent physical threat at the time. In fact, Defendants claim in their opposition that Mr. Coy ignored a warning to put down a gun. But they have no evidence at this point to support that claim, nor can it be substantiated on the face of the complaint. They are welcome to explore that defense during discovery, and the Court can make a decision on whether there are disputed

issues of material fact on summary judgment. But qualified immunity is an affirmative defense that must be undisputable from the *face* of the Complaint. Nothing in this Complaint so much as suggests that Tucker was entitled to shoot Mr. Coy. That ends the matter.

The Fifth Circuit's recent motion-to-dismiss decision in *Waller v. Hanlon*, 922 F.3d 590 (5th Cir. 2019) strongly reinforces that conclusion. There, two police officers responded to a report of a residential burglary. *Id.* at 595. The homeowner heard the noise and went to investigate "holding a small gun." *Id.* The parties disputed what happened next—in the plaintiff's telling, the homeowner was no longer holding the gun when he was shot. The police insisted that the homeowner had become belligerent and pointed the gun at the officers. *Id.* Faced with that dispute, the Fifth Circuit held that at the pleading stage "allegations need not conclusively establish the plaintiffs' theory of the case." *Id.* at 601. In so holding, the Fifth Circuit differentiated the defense of qualified immunity at the motion to dismiss stage from cases involving summary judgment. Dismissal is required, the court observed, where the plaintiff, after discovery, could rely only on circumstantial and speculative evidence to prove a genuine factual dispute. *Id.* at 601. But not before discovery.

At this early stage of the litigation, Plaintiffs have amply alleged a Section 1983 excessive force claim against Tucker. The motion to dismiss should be denied.

## III. Defendants' motion with respect to the other officers that were part of the SWAT team should also be denied.

Defendants' motion also should be denied with respect to the other officers that were part of the SWAT team. Assuming it is true that none of the other officers participated in shooting Mr. Coy—a fact that plaintiffs should have an opportunity to test in discovery—those officers should be held liable for their failure to intervene. It is long-established law that a police officer has an "affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *O'Neill v. Krzmeninski*, 839 F.2d 9, 11 (2d Cir. 1988). In *Harris v. Chanclor*, 537 F.2d 203 (5th Cir. 1976), for example, the Fifth Circuit approvingly cited the leading case in this line, *Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972). *Byrd's* command is directly on point in this case:

> We believe it is clear that one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge. That responsibility obviously obtains when the nonfeasor is a supervisory officer to whose direction misfeasor officers are committed. *So, too, the same responsibility must exist as to nonsupervisory officers who are present at the scene of such summary punishment, for to hold*

> *otherwise would be to insulate nonsupervisory officers*
> *from liability for reasonably foreseeable consequences*
> *of the neglect of their duty to enforce the laws and*
> *preserve the peace*

*Id.* at 11. (emphasis added) *See also Ware v. Reed*, 709 F.2d 345, 353 (5th Cir. 1983) (holding that a district judge was obligated to instruct a jury on "the defendant's alleged acquiescence in the unconstitutional conduct of other officers"); *United States v. Koon*, 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994), *rev'd in part on other grounds by Koon v. United States*, 518 U.S. 81 (1996). The Complaint alleges that Mr. Tucker shot Mr. Coy and the other officers did not prevent this unconstitutional use of force. That states a claim under Section 1983.

Again, after discovery, the other officers may be able to assert defenses or arguments about this claim. They may contend, for example, that they had no opportunity to prevent Mr. Tucker's killing of Mr. Coy. But that defense is not obvious from the face of the complaint, and therefore qualified immunity should be denied.

## IV. Defendants' motion to dismiss with respect to Waller County should be denied.

Next, Defendants argue that Plaintiffs have failed to plead a municipal liability claim against Waller County. Specifically, Defendants assert that the Complaint (a) fails to identify the relevant policy maker; and (b) cannot identify

an official policy or custom that was the moving force behind the constitutional violations.

Both of these arguments are incorrect. The Supreme Court has held that a "plaintiff seeking to impose liability on a municipality under Section 1983 [must] identify a municipal policy or custom that caused the plaintiff's injury." *Goodman v. Harris County*, 571 F.3d 388 (5th Cir. 2009). A plaintiff must identify: (1) an official policy (or custom) (2) a policymaker that can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy or custom." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002).[2] Such a policy or custom can be an unwritten one so long as it is a "persistent, widespread practice" of the relevant officials such that it is "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id.* "Even a facially innocuous policy will support liability if it was promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result." *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001).

---

[2] Defendants do not appear to dispute the third prong of this test. *See* Mot. at 12-14.

The Complaint states a claim for municipal liability under these standards, because the County adopted numerous policies that both resulted in constitutional violations and were adopted with deliberate indifference to the risk that constitutional violations would result. The Complaint extensively alleges these violations, but even analysis of a few of them makes the point. For example, the Complaint alleges that Waller County promulgated a policy or custom under which SWAT teams were used to execute search warrants against "non-violent offenders and by permitting their SWAT teams to use lethal force against non-threatening individuals." Compl. ¶ 31. Use of a SWAT teams in those circumstances led directly to Mr. Coy's death. Many courts around the United States have held that the decision to use a SWAT team to effect a seizure can itself amount to excessive force. *See Holland v. Harrington*, 268 F.3d 1179, 1190 (10th Cir. 2001) (explaining that the court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."); *Z.J. by & through Jones v. Kansas City Bd. of Police Commissioners*, 931 F.3d 672, 688 (8th Cir. 2019) ("An officer's decision to authorize a SWAT team to execute a warrant can, in some cases, constitute a Fourth Amendment violation."); *Estate of Smith v. Marasco*, 430 F.3d 140, 149 (3d Cir. 2005) ("We stressed in *Smith I* that a decision to employ a SWAT-type

team can constitute excessive force if it is not "objectively reasonable" to do so in light of "the totality of the circumstances").

Similarly, the Complaint alleges that Waller County's plan for use of the SWAT team violated the Constitution in numerous ways, essentially by creating an operational plan that permitted officers to perform a dynamic entry into Mr. Coy's house without giving anyone inside a meaningful opportunity to voluntarily open the door for the police, allowed the police to break open the window and the door of Mr. Coy's home before meaningfully announcing the presence of officers, and planning such an assault at a time they knew that the people inside the house would be asleep. Compl. ¶ 32. These too set forth violations of constitutional rights by municipalities. *See Jensen v. City of Oxnard*, 145 F.3d 1078, 1083 (9th Cir. 1998) (holding that similar policies regarding SWAT teams "are sufficient to allege a plausible link between the policymaker's inadequate decision and the particular injury alleged").

The person who promulgated this policy was Sheriff Smith. Indeed, Defendants themselves concede that the county and Sheriff Smith should be treated interchangeably. That custom or policy led to Mr. Coy's death—had Waller County used a SWAT team at another time of the day, or not used a SWAT team or taken other steps to ensure the safety of innocent residents and homeowners, Mr. Coy would not have been killed.

To be sure, Defendants may be able to show on summary judgment that their decision to use a SWAT team was objectively reasonable. As with the use of excessive force against Mr. Coy, that is what discovery is for. On the facts as alleged—again, that a SWAT team was used as a matter of course for non-violent offenders—plaintiffs state a claim at this early stage.

## V.    The Court should agree to dismiss the Texas state law claims, punitive damages claims against Waller County, and the claims against the Sheriff's office.

Defendants assert that all of Plaintiffs' Texas law claims are barred by sovereign/governmental immunity. Although Plaintiffs believe they could plead valid Texas law claims, *Texas Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575, 580 (Tex. 2001), Plaintiffs ultimately agree that this case should process primarily under Section 1983. Plaintiffs therefore will agree to the dismissal of these claims.

Defendants state that "[t]o the extent that Plaintiffs seek punitive damages against the County Defendants under Section 1983, this claim for damages should also be dismissed." Mot. at 19. We agree—the punitive damages claims were intended to be limited to the individual defendants.

Plaintiffs also take at face value Defendants' representation that the Waller County Sheriff's office is a non-jural entity and agree that it should be dismissed from this suit (subject to revival if discovery were to show that this representation is not correct).

Finally, Plaintiffs accept Defendants' representation that the claims brought against the County encompass the claims against Sheriff Smith in his official capacity.

## VI.    If this Complaint is dismissed, Plaintiffs seek leave to amend.

In the alternative, Plaintiffs seek leave to amend their complaint with respect to the claims set forth in Parts I through IV above. The Fifth Circuit has held many times that a plaintiff must be allowed to amend before the complaint is dismissed. This is both because of the absolute right to amend under Federal Rule of Civil Procedure 15(a)—a motion to dismiss is not a responsive pleading, *see Albany Ins. Co. v. Almacenadora Somex S.A.*, 5 F.3d 907, 910–11 (5th Cir. 1993)—and because this Court should freely grant leave to amend. *See Summer v. Land & Leisure, Inc.*, 664 F.2d 965, 971 (5th Cir. 1981) ("Dismissal for failure to comply with Rule 9(b) is almost always with leave to amend."); *see also Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000) ("Such deficiencies do not normally justify dismissal of the suit on the merits and without leave to amend, at least not in the absence of special circumstances."). Given that Plaintiffs have not yet amended their complaint,

they should be given leave to do so in the event the Court dismisses any of their claims other than those conceded.

## CONCLUSION

This Court should deny Defendants' motion to dismiss except as to the limited claims set forth above.

Dated: November 14, 2019

Respectfully submitted,

WRIGHT CLOSE & BARGER, LLP

*/s/ Raffi Melkonian*
Raffi Melkonian
Texas State Bar No. 24090587
Federal Bar No. 2338805
One Riverway, #2200
Houston, Texas 77056
Telephone: (713) 572-4321
Facsimile: (713) 572-4320
melkonian@wrightclosebarger.com

and

Robert E. Ammons
Texas State Bar No. 01159820
Federal Bar No. 11742
Adam A. Milasincic
Texas State Bar No. 24079001
Federal Bar No. 1339915
THE AMMONS LAW FIRM
3700 Montrose Boulevard
Houston, Texas 77006
Telephone: (713) 523-1606
Facsimile: (713) 523-4159
rob@ammonslaw.com
adam@ammonslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that, on the November 14, 2019, I caused to be electronically submitted the foregoing document with the clerk of court for the U.S. District Court Southern District of Texas, Houston Division using the electronic case files system of the Court. I hereby certify that I have caused all counsel of record to be electronically served via the Court's CM/ECF system.

*/s/ Raffi O. Melkonian*
Raffi O. Melkonian

## APPENDIX

1. *Betton v. Belue*, ___ F.3d ___ , 2019 WL 5700353 (4th Cir. Nov. 5, 2019)

2. *Cox v. Kaelin*, 577 Fed. App'x 306 (5th Cir. 2014)

3. *Geiger v. Sloan*, No. 18-60480, 2019 WL 3763525 (5th Cir. Aug. 8, 2019)

# Tab 1

2019 WL 5700353
Only the Westlaw citation is currently available.
United States Court of Appeals, Fourth Circuit.

Julian Ray BETTON, Plaintiff - Appellee,
v.
David BELUE, in his individual capacity,
Defendant - Appellant,
and
Bill Knowles, in his individual capacity and official
capacity as Commander of the 15th Circuit Drug
Enforcement Unit Task Force; Jimmy Richardson,
II, in his individual capacity and official capacity
as 15th Circuit Solicitor; Dean Bishop, in his
individual capacity; Chad Guess, in his individual
capacity; Frank Waddell, in his individual
capacity; Chris Dennis, in his individual capacity;
The City of Myrtle Beach, Defendants.

No. 18-1974
|
Argued: September 18, 2019
|
Decided: November 5, 2019

**Synopsis**
**Background:** Homeowner, who was shot when plain-
clothed law enforcement officers were executing a warrant
to search the home for marijuana and other illegal
substances, brought § 1983 action against one of the
officers, alleging excessive force. The United States
District Court for the District of South Carolina, A. Marvin
Quattlebaum, Jr., J., 2018 WL 3744957, adopted the report
and recommendation of Kaymani D. West, United States
Magistrate Judge, 2018 WL 4404073, and denied officer's
motion for summary judgment based on qualified
immunity. Officer brought interlocutory appeal.

**Holdings:** The Court of Appeals, Keenan, Circuit Judge,
held that:

fact issues existed as to whether officers had announced
their presence and whether homeowner was pointing a gun
at officer, and

officer's alleged conduct violated clearly established law
in April 2015.

Affirmed and remanded.

Appeal from the United States District Court for the
District of South Carolina, at Florence. A. Marvin
Quattlebaum, Jr., District Judge. (4:15-cv-04638-AMQ-
KDW)

**Attorneys and Law Firms**

ARGUED: Michael Warner Battle, BATTLE LAW FIRM,
LLC, Conway, South Carolina; Sandra J. Senn, SENN
LEGAL, LLC, Charleston, South Carolina, for Appellant.
Narendra K. Ghosh, PATTERSON HARKAVY, LLP,
Chapel Hill, North Carolina, for Appellee. ON BRIEF:
James Richard Battle, II, BATTLE LAW FIRM, LLC,
Conway, South Carolina, for Appellant. Burton Craige,
Bradley J. Bannon, Paul E. Smith, PATTERSON
HARKAVY LLP, Chapel Hill, North Carolina; Jonny
McCoy, LAW OFFICE OF JONNY MCCOY, Myrtle
Beach, South Carolina, for Appellee.

Before KING and KEENAN, Circuit Judges, and Joseph
R. GOODWIN, United States District Judge for the
Southern District of West Virginia, sitting by designation.

**Opinion**

Affirmed by published opinion. Judge Keenan wrote the
opinion, in which Judge King and Judge Goodwin joined.

BARBARA MILANO KEENAN, Circuit Judge:

**\*1** In the afternoon of April 16, 2015, a team of plain-clothed law enforcement officers armed with "assault style rifles" used a battering ram to enter Julian Ray Betton's dwelling to execute a warrant authorizing a search for marijuana and other illegal substances. The officers did not identify themselves as "police" or otherwise announce their presence before employing the battering ram. From the rear of his home, Betton heard a commotion but did not hear any verbal commands. Responding to the tumult, Betton pulled a gun from his waistband and held it down at his hip.

Three officers, including Myrtle Beach, South Carolina police officer David Belue, fired a total of 29 shots at Betton, striking him nine times. Betton suffered permanent paralysis resulting from his gunshot wounds. While Officer Belue originally maintained that Betton had been the first person on the scene to fire a weapon, a later investigation revealed that Betton never discharged his .45 caliber pistol. Thereafter, Officer Belue revised his account of the events, stating that Betton had pointed his weapon at the officers.

Betton filed suit under 42 U.S.C. § 1983 against Officer Belue, alleging unlawful entry and the use of excessive force in violation of the Fourth Amendment. Officer Belue moved for summary judgment on the ground of qualified immunity, and the district court denied his motion. Officer Belue appeals only the court's denial of qualified immunity with respect to the excessive force claim.

Construing the facts in the light most favorable to Betton, as we are required to do at this stage of the proceedings, we agree with the district court that disputes of material fact preclude an award of summary judgment. A jury reasonably could find under the facts presented that Betton did not pose a threat to the officers justifying the use of deadly force. Additionally, based on our decision in *Cooper v. Sheehan*, 735 F.3d 153 (4th Cir. 2013), we further hold that Betton's Fourth Amendment right to be free from the use of excessive force was clearly established at the time the incident occurred. We therefore affirm the district court's order and remand the case for further proceedings.

## I.

Officer Belue was a member of a multi-jurisdictional "drug enforcement unit" (DEU) in South Carolina charged with the investigation of individuals participating in illegal drug activity. In 2015, DEU agents began investigating Betton, who lived in a duplex-style residence in Myrtle Beach, South Carolina. Agent Chad Guess led the investigation and worked with a confidential informant, who had purchased marijuana from Betton at his home on two occasions. The informant paid Betton about $100 in each transaction; the respective amounts purchased were seven grams and eight grams of marijuana.

Based on this information, Agent Guess obtained a warrant authorizing a search of Betton's residence for marijuana and other illegal drugs. This warrant permitted entry into Betton's residence using a standard "knock and announce" procedure requiring the officers, before forcibly effecting entry in the absence of a response, to knock on the dwelling's entry door and to announce their presence. *See United States v. Dunnock*, 295 F.3d 431, 434 (4th Cir. 2002).

**\*2** Prior to executing the search, Agent Guess led about ten DEU agents, including Officer Belue, in a pre-search briefing. The briefing materials included information that the informant had observed two firearms inside Betton's apartment and two security cameras at the front door. The briefing materials also stated Betton's criminal history, which included convictions for marijuana trafficking in 2003, cocaine trafficking in 2007, a prior arrest for aggravated robbery in 2008, and an outstanding arrest warrant for a probation violation in Ohio.

About 3 p.m. on the day of the search, eleven law enforcement officers in three unmarked cars arrived at Betton's home. Although the cars' emergency lights were activated, the sirens were not. The shades on the front

windows of the home were drawn, blocking any view through the windows. The agents were wearing a variety of plain clothes and bullet-proof vests. Officer Belue wore a baseball cap, and another agent wore a black cloth mask obscuring the lower half of his face. The word "police" appeared in small lettering on Officer Belue's and other officers' vests.

When Officer Belue stepped out of his car, Betton's neighbor, Santos Garcia, was standing next to Betton's front porch steps. Officer Belue pointed his firearm at Garcia, ordered him to the ground, and quickly led a group of five officers up the front steps to Betton's front door. Without knocking or announcing their arrival, Officer Belue opened the screen door while Agent Guess used a battering ram to gain entry through the front door. Officer Belue then followed two other agents as they entered the home with their "assault style rifles."

At that time, Betton was leaving a bathroom in the back of the residence. Hearing the break-in but no verbal commands or any other indication that the intruders were members of law enforcement,[1] Betton reached for his gun in his back waistband. Betton clarified that when he reached for his gun, he was "maybe a step from the living room[,]" where the officers had entered through the front door. Betton further described his location as standing "halfway in the living room, halfway in the hallway." Betton stated that he held the gun "by my hip. I had it down. I didn't get a chance to get to pull it up or anything."

The three officers, including Officer Belue, fired a total of 29 shots at Betton. Officer Belue fired nine of those shots. Although Betton was struck nine times, the origin of the bullets that struck Betton is not established in the record. Officer Belue stated that after Betton was struck, Betton dropped his weapon, took a few steps backward, and fell into the hallway. The agents ultimately recovered about 220 grams of marijuana from Betton's home.

Officer Belue initially reported that Betton fired his weapon at the officers first, but an investigation revealed that Betton's gun had not discharged. Officer Belue now maintains that Betton pointed his weapon at the officers.

The DEU filed a charge against Betton for "pointing or presenting a weapon" at law enforcement, in violation of South Carolina state law, but the South Carolina Attorney General's Office later withdrew the charge.

Officer Belue also initially had asserted that the agents had knocked on Betton's door and announced their presence, and had waited before forcibly entering the home. However, footage from the video cameras on Betton's front porch showed that the officers had not knocked on the door or announced their presence, and had not waited any length of time before using the battering ram to gain entry.

**\*3** To the contrary, the video recordings showed that the officers ran up the front steps and immediately began using the battering ram. Moreover, Garcia confirmed that the officers did not announce that they were law enforcement personnel before entering the home. The record before us also contains a statement from a former DEU agent, who related that the DEU agents "almost always forcibly entered [residences] without knocking and announcing" their presence.

As a result of the shooting, Betton was placed in a medically induced coma for six weeks, endured numerous surgeries, and now is permanently paralyzed. In his complaint, Betton alleged claims under 42 U.S.C. § 1983, asserting that Officer Belue and several other officers violated his Fourth Amendment rights by entering his residence unlawfully and by using excessive force in shooting him.[2] Betton's claims against the other officers have been dismissed after settlement of those claims out of court.

Officer Belue filed a motion seeking summary judgment on the ground of qualified immunity. A magistrate judge recommended that the district court deny Officer Belue's motion. Regarding Betton's unlawful entry claim, the magistrate judge found that the officers had not knocked or announced their presence before entering, and that there were no exigent circumstances warranting abandonment of the "knock and announce" procedure. The district court adopted the magistrate judge's recommendation to deny qualified immunity on the unlawful entry claim, and

Officer Belue has not challenged this ruling in the present appeal.

With respect to Betton's excessive force claim, the magistrate judge found that there were material facts in dispute regarding whether Betton had pointed a gun at the officers before Officer Belue fired his weapon. Thus, the magistrate judge concluded that a jury could find that Betton did not pose an immediate deadly threat to Officer Belue or others justifying the use of deadly force. The magistrate judge further concluded that as of 2015, the law in this Circuit was clearly established that a person is entitled to be free from excessive force when the person "is on his property or in his residence, is in possession of a gun that he is not pointing at police officers, and is not given a warning or command to drop the gun before he is shot." The district court adopted the magistrate judge's recommendation and denied Officer Belue's motion for summary judgment on the excessive force claim. Officer Belue challenges this holding in the present interlocutory appeal.

## II.

### A.

**\*4** We review de novo the district court's denial of summary judgment. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218 (4th Cir. 2018). Summary judgment is appropriate only when there are no material facts in dispute, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

In conducting our review, we construe the evidence in the light most favorable to Betton, the non-moving party. *Wilson*, 893 F.3d at 218. We do not weigh the evidence or make credibility determinations. *Id.*

The doctrine of qualified immunity "balances two important interests," namely, the need to hold accountable public officials who exercise power irresponsibly, and the need to shield officials who perform duties responsibly from "harassment, distraction, and liability." *Id.* at 219 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). The burden of establishing the affirmative defense of qualified immunity rests on the party seeking to invoke it. *Id.*

In considering whether Officer Belue met his evidentiary burden and should prevail on this affirmative defense, we employ a two-step inquiry. First, we consider whether the facts alleged or shown, taken in the light most favorable to Betton, establish that Officer Belue's conduct violated Betton's Fourth Amendment right to be free from the use of excessive force. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If this initial prong is satisfied, we will evaluate the second prong and answer the question whether the right at issue was "clearly established" at the time of the officer's conduct. *Id.*

### B.

We first consider whether the facts as alleged show that Officer Belue's conduct violated the Fourth Amendment. *See id.* Officer Belue contends that his conduct of firing his weapon at Betton did not constitute the use of excessive force. Focusing on "the instant" that he fired his weapon, Officer Belue argues that his use of deadly force was justified because Betton posed a serious threat by drawing his pistol. Officer Belue further submits that based on this threat, it is irrelevant whether Betton knew that the intruders were members of law enforcement. According to Officer Belue, the factual question whether the officers had announced their presence is relevant only to Betton's separate claim of unlawful entry, which is not at issue in

this appeal. We disagree with Officer Belue's arguments.

The Fourth Amendment prohibits law enforcement officers from using excessive or unreasonable force in the course of making an arrest or otherwise seizing a person. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019). We evaluate whether an officer has used excessive force based on a standard of "objective reasonableness." *Graham*, 490 U.S. at 399, 109 S.Ct. 1865. We assess the reasonableness of the officer's conduct based on the circumstances confronting the officer "immediately prior to and at the very moment" he fired his weapon. *Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991). However, while we focus our review of reasonableness on the "moment that force is employed," *Waterman v. Batton*, 393 F.3d 471, 477 (4th Cir. 2005), we view the facts and any reasonable inferences in the light most favorable to Betton, the non-moving party. *Harris*, 927 F.3d at 272.

**\*5** An officer may use deadly force when the officer has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). We have explained that an officer does not possess an "unfettered authority to shoot" based on "mere possession of a firearm by a suspect." *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013). Instead, an officer must make a "reasonable assessment" that he, or another, has been *threatened* with the weapon," in order to justify the use of deadly force. *Id.*

Our decision in *Cooper* is determinative in our present analysis. There, we concluded that a suspect, who was holding a firearm at his side on his property while investigating a noise outside his home, did not present a threat justifying the officers' use of deadly force. 735 F.3d at 155, 159. In that case, two officers had arrived at Cooper's property around 11:30 p.m., in response to a report of an altercation between two men. *Id.* at 155. When they arrived, the officers heard an argument taking place inside the home. *Id.* One officer tapped on a window with his flashlight, but did not announce his presence or identify himself as a member of law enforcement. *Id.* Cooper heard

the noise at his window, looked out the back door, and "called out for anyone in the yard to identify himself, but no one responded." *Id.* Investigating further, Cooper walked outside onto his dark porch holding a shotgun with the muzzle pointed downward. *Id.* "Reacting to the sight of Cooper and his shotgun," the officers fired their weapons without warning, striking Cooper. *Id.* at 156.

We explained that although Cooper held a firearm, he had not made any sudden moves or threats, and had not ignored any commands given by the officers. *Id.* at 159. Moreover, we stated that if the officers had identified themselves as members of law enforcement, they may have been reasonable in concluding that "a man who greets law enforcement with a firearm is likely to pose a deadly threat." *Id.* (citing *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996) ("No citizen can fairly expect to draw a gun on police without risking tragic consequences.")). Instead, in view of the facts presented, we held that Cooper had a "reasonable rationale" for bearing a firearm while investigating a noise on his property and, thus, that the officers were not entitled to qualified immunity in defense of Cooper's claims against them. *Id.* at 160 (citation omitted).

Our analysis in *Cooper* is directly applicable here. Officer Belue shot Betton, who was holding a firearm "down," without first identifying himself as a member of law enforcement or giving any commands to Betton. We reject Officer Belue's attempt to distinguish *Cooper* by arguing his own version of the evidence, namely, that Betton drew his pistol, in a direction "coming up" from his waistband toward the officers. At its core, Officer Belue's argument collapses because of his failure to accept the facts in the light most favorable to Betton as found by the district court.[3]

**\*6** Betton was asked in his deposition numerous times to describe his conduct that preceded the shooting. According to Betton, he heard the front door "kicked in" while he was in the hallway after leaving the bathroom in the rear of the residence. After the initial noise, Betton heard no other sounds. And, when Betton was "maybe a step from the living room" where the front door is located, Betton saw

"stuff coming at [him,]" in the form of "strange shadows" rather than people, and instinctively reached for his gun in his waistband. Betton stated that once he removed the gun from his waistband, he held the gun "by [his] hip. I had it down. I didn't get a chance to get to pull it up or anything."

In contrast, as noted above, Officer Belue initially maintained that the officers announced their presence outside the dwelling, and that Betton fired the first shot in the encounter. However, when those accounts were discredited, Officer Belue stated that Betton had pointed his gun at the officers. The magistrate judge and district court construed the facts in Betton's favor as required at this stage of the proceedings, and concluded that Betton had reached for his gun and had "held it by his right side" when the officers fired 29 shots without warning or issuing any commands.

Our review in this interlocutory appeal is predicated on our construction of the factual record in the light most favorable to the non-movant, Betton. *See Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). For this reason, the decisions cited by Officer Belue in which suspects made "sudden moves" to reach for potential weapons in disregard of officers' verbal commands, are inapplicable here. *See Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001) (officer was justified in using deadly force when a suspect lowered his hands toward his waist, in violation of the officer's verbal commands, even though suspect did not possess a firearm); *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991) (officer was justified in using deadly force when a suspect in the passenger seat of a stopped vehicle repeatedly refused to raise his hands and appeared to be gripping an object).

Unlike these cases cited by Officer Belue, the facts in the present case align with the facts in *Cooper*. Like the citizen in *Cooper*, Betton could not have known that members of law enforcement caused the noise that he heard on his property, because the officers had failed to announce their presence at any time before firing their weapons. And as in *Cooper*, neither Officer Belue nor the other officers on the scene issued any commands after entering Betton's residence and observing him holding a gun at his side.

If Officer Belue or another officer had identified themselves as members of law enforcement, Officer Belue reasonably may have believed that Betton's presence while holding a firearm posed a deadly threat to the officers. *Cooper*, 735 F.3d at 159; *Elliott*, 99 F.3d at 644. And had Betton disobeyed a command given by the officers, such as to drop his weapon or to "come out" with his hands raised, Officer Belue reasonably may have feared for his safety upon observing Betton holding a gun at his side. *See, e.g., Sigman v. Town of Chapel Hill*, 161 F.3d 782 (4th Cir. 1998) (officer was justified in using deadly force after suspect failed to obey command to stop advancing toward officer while carrying a knife). However, under our precedent, Officer Belue's failure to employ any of these protective measures rendered his use of force unreasonable.

Officer Belue claims, nevertheless, that we are precluded from considering the officers' failure to identify themselves, because that failure relates to Betton's distinct unlawful entry claim now pending in the district court. We find no merit in this argument. We are required to consider the relevant circumstances immediately preceding the moment that force was used. *See Waterman*, 393 F.3d at 477. And, as of that time, the officers had not announced their presence in Betton's home. Moreover, were we to ignore the officers' failure to identify themselves or to give any verbal commands, we would be discounting the analysis in *Cooper* and other prior decisions in which we found such facts critical in determining whether excessive force was used. 735 F.3d at 158-60; *see also Anderson*, 247 F.3d at 130-32; *Sigman*, 161 F.3d at 787; *Elliott*, 99 F.3d at 642-44; *Slattery*, 939 F.2d at 215. For these reasons, we agree with the district court that a jury reasonably could find that Officer Belue violated Betton's Fourth Amendment right to be free from the use of excessive force.

C.

**\*7** Having determined that Officer Belue's actions in these circumstances violated the Fourth Amendment as a use of excessive force, we turn to consider the second step of the qualified immunity analysis, namely, whether Officer Belue's conduct violated a constitutional right that was clearly established at the time the conduct occurred. A right is "clearly established" when the contours of the right are sufficiently clear to ensure that a "reasonable official" would have understood that the alleged conduct was unlawful. *Wilson*, 893 F.3d at 221 (quoting *Reichle v. Howards*, 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012)). Decisions by the Supreme Court, this Circuit, and the highest court of South Carolina are relevant on the issue of notice to Officer Belue concerning clearly established constitutional rights. *Id.*; *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998).

The key inquiry in this regard is not whether one of these courts has considered *identical* factual circumstances and held that an officer's conduct violated particular constitutional rights. *Wilson*, 893 F.3d at 221. Instead, we consider whether officers within our jurisdiction have been provided fair warning, with sufficient specificity, that their actions would constitute a deprivation of an individual's constitutional rights. *Id.*

The officer's use of deadly force in *Cooper* occurred in 2007. Since issuing our decision in *Cooper* in 2013, the Supreme Court has emphasized that courts are "not to define clearly established law at a high level of generality," and that "specificity is especially important in the Fourth Amendment context." *Kisela v. Hughes*, ‌— U.S. ‌—, 138 S. Ct. 1148, 1152, 200 L.Ed.2d 449 (2018) (citations and alterations omitted).

Defined at the level of specificity required by the Supreme Court, the question before us here is whether it was clearly established in April 2015 that shooting an individual was an unconstitutional use of excessive force after the officer: (1) came onto a suspect's property; (2) forcibly entered the suspect's home while failing to identify himself as a member of law enforcement; (3) observed inside the home

an individual holding a firearm at his side; and (4) failed to give any verbal commands to that individual. The answer, as explained in our 2013 decision in *Cooper*, plainly is yes. As set forth above, the critical circumstances involving the use of deadly force in *Cooper* are present in the case before us.[4] Thus, we conclude that Officer Belue's use of deadly force presents an "obvious case" exhibiting a violation of a core Fourth Amendment right. *Kisela*, 138 S. Ct. at 1153.

Our conclusion is not altered by Officer Belue's attempt to distinguish *Cooper* in two respects: (1) arguing that it was not feasible to give Betton a warning given the "split-second situation" facing Officer Belue, and (2) arguing that Betton was a "fugitive" and an "active drug dealer." First, we acknowledge that officers often must make rapid judgments in circumstances that are "tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397, 109 S.Ct. 1865. But here, like the officers in *Cooper*, Officer Belue and his fellow officers could have announced police presence at any time before shooting Betton. Such identification would have put Betton on notice that the individuals who entered in his home were members of law enforcement, alleviating Betton's then-justified concern to protect himself from the unknown intruders.

**\*8** Second, no information in Betton's criminal history suggested that he was inherently violent to a degree that the officers would have been justified in storming into his home unannounced and in firing their weapons at him when he did not present a current threat. Notably, the search warrant was based on Betton's conduct of selling small amounts of marijuana on two occasions. And, although the informant observed security cameras and two firearms in Betton's home, there was no evidence indicating that Betton had engaged in threatening or violent conduct toward the confidential informant.

Accordingly, we conclude that Officer Belue's conduct of shooting Betton while Betton held a firearm by his side does not qualify as the type of "bad guesses in gray areas" that qualified immunity is designed to protect. *Braun v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). Thus, we hold under our established standard of review that

Officer Belue's alleged conduct violated Betton's Fourth Amendment right to be free from the use of excessive force, a right that was clearly established at the time the conduct occurred.

For these reasons, we affirm the district court's order denying Officer Belue's motion for summary judgment and remand the case for further proceedings.

*AFFIRMED*

**All Citations**

--- F.3d ----, 2019 WL 5700353

III.

## Footnotes

1    Officer Belue stated that another officer announced "police" at least one time upon entry into Betton's home. But, as explained further below, we construe the evidence in the light most favorable to Betton, the non-moving party. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218 (4th Cir. 2018).

2    Betton also named the City of Myrtle Beach, South Carolina as a defendant, alleging that the DEU had a widespread practice of executing search warrants without following the "knock and announce" procedure. The district court denied the City's motion for summary judgment, concluding that a jury could determine that the City ratified the DEU's conduct. The City did not appeal that ruling and, accordingly, that claim is not part of this appeal.
Betton's complaint also included several state law claims against Officer Belue, including claims for assault, battery, and trespass in violation of South Carolina law. The district court denied Officer Belue's motion for summary judgment on those claims, which ruling Officer Belue did not appeal. Betton also alleged that Officer Belue unlawfully had used "SWAT-like" tactics to enter Betton's home, in violation of the Fourth and Fourteenth Amendments, but the district court entered an award of summary judgment to Officer Belue on that claim.

3    To the extent Officer Belue attempts to challenge the district court's conclusion that a genuine dispute of fact exists, such an argument lies outside our jurisdiction in this interlocutory appeal. *See Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015) ("The conclusion of the district court that a disputed issue of fact exists as to a particular point is not appealable under the collateral order doctrine.").

4    We agree with Officer Belue that our decision in *Hensley ex rel. North Carolina v. Price*, 876 F.3d 573 (4th Cir. 2017), cannot form the basis of a clearly established right. That decision issued after April 2015, when the deadly force was used in this case. *See Wilson*, 893 F.3d at 225 (explaining that the proper question is what law was clearly established at the time the incident in question occurred).

# Tab 2

577 Fed.Appx. 306
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 5th Cir.
Rules 28.7 and 47.5.
United States Court of Appeals,
Fifth Circuit.

Elmer COX, Plaintiff–Appellee
v.
Jim KAELIN, Individually, Defendant–Appellant.

No. 13–41343
|
Summary Calendar.
|
Aug. 7, 2014.

**Synopsis**
**Background:** Former employee brought § 1983 action
against county sheriff, alleging First Amendment
retaliation. Sheriff moved to dismiss for failure to state a
claim. The United States District Court for the Southern
District of Texas denied motion. Sheriff appealed.

**Holdings:** The Court of Appeals held that:

motion to dismiss was immediately appealable as it was
inextricably intertwined with sheriff's claim of qualified
immunity;

employee's allegations were sufficient to state a First
Amendment retaliation claim; and

sheriff was not entitled to qualified immunity.

Affirmed.

**Attorneys and Law Firms**

**\*307** Christopher John Gale, Gale, Wilson & Sanchez,
P.L.L.C., San Antonio, TX, for Plaintiff–Appellee.

Keith B. Sieczkowski, Esq., Branscomb, P.C., Corpus
Christi, TX, for Defendant–Appellant.

Appeal from the United States District Court for the
Southern District of Texas, USDC No. 2:12–CV–339.

Before DENNIS, CLEMENT, and GRAVES, Circuit
Judges.

**Opinion**

PER CURIAM:[*]

Elmer Cox, a former employee of the Nueces County
Sheriff's Department, brought suit pursuant to 42 U.S.C. §
1983 against Jim Kaelin, the Sheriff of Nueces County,
Texas, asserting that Kaelin violated his First Amendment
rights. Cox alleges that Kaelin retaliated against him in
response to his support for Kaelin's opponent in the 2012
race for Nueces County Sheriff and his involvement in the
political process, in violation of his First Amendment
rights to free speech and association. The district court
denied Kaelin's motion to dismiss, in which he asserted
that Cox had failed to state a claim on which relief could
be granted and raised the defense of qualified immunity.
Kaelin brings this interlocutory appeal of that judgment.
For the reasons that follow, we AFFIRM the judgment of
the district court.

BACKGROUND

## I.

In Cox's Fifth Amended Complaint, he alleges the following:

Prior to his termination, Cox had been employed by the Nueces County Sheriff's Department for over twenty years. During the last ten years of his employment, he had served as the President of the Nueces County Sheriff Officers' Association, a Political Action Committee ("PAC"). In early May 2012, Kaelin—who was the Sheriff of Nueces County at the time—became upset that Thomas Burnside—who was employed by the Sheriff's Department and was a chairman of the PAC—began supporting Kaelin's opponent in the upcoming election. The PAC itself, as well as Cox, also seemed to be supporting Kaelin's opponent, which apparently also upset Kaelin.

Sometime around May 15, 2012, Kaelin advised Cox that he should remove Burnside as a chairman of the PAC, in an apparent attempt to sway the PAC to support his candidacy. Kaelin informed Cox that Burnside was going to be transferred to a position working in the Nueces County Jail, which he reportedly characterized as a demotion. Kaelin threatened the same action against Cox, who at the time had been working on a task force for the U.S. Drug Enforcement Administration **308** ("DEA"), should he ignore Kaelin's request to remove Burnside from his chairmanship. Kaelin presented Cox with an ultimatum, stating he had until May 18, 2012 to respond to Kaelin's request. Cox thereafter suspended the PAC for a short period of time in order to determine his course of action and to fill vacancies. However, Cox reinstated the PAC, which resumed its activities and held a meeting sometime around May 28, 2012.

On May 31, 2012, Cox was summoned into his supervisor's office, where he was told to call Kaelin on his cell phone. During the phone conversation, Kaelin allegedly became very upset, accused Cox of lying to him, and remarked, "Remember what I said I was going to do?"

Kaelin thereafter reassigned Cox to a position in the jail, giving him 48 hours to vacate his position on the DEA Task Force. Cox characterizes this reassignment as a demotion. As a result of his transfer to the jail, Cox's vehicle was taken away, including the gas, mileage, and insurance benefits that came with it. In addition, Cox was no longer eligible for overtime pay, which amounted to over $10,000 per year. Cox was initially assigned to work the "graveyard shift," which encompasses early morning hours, and remained in that position for an extended period of time.

On March 28, 2013, Cox's employment with the Nueces County Sheriff's Department was terminated. Cox presumes that his employment was terminated due to his dissemination of a recorded conversation, wherein Kaelin threatened an officer who has since resigned from his position. At the time, Cox was working in the jail along with Burnside and another employee who apparently was previously assigned to the DEA Task Force, but who was also reassigned by Kaelin to jail duty for political-related reasons.

Cox avers that his involvement with the PAC, Burnside, or the election was in no way associated with his employment, and he did not discuss these matters during work hours. Cox asserts that his involvement with the political process and his known support for Kaelin's opponent in the upcoming election were the causes of his demotion to a position in the jail, as well as his eventual termination.

## II.

Cox then filed this § 1983 action in federal court, naming both Nueces County, Texas, a municipality, and Kaelin, individually, as defendants. Cox asserted that the defendants maintain a pattern or practice of depriving persons of their First Amendment rights, and that defendants retaliated against him in violation of the First Amendment because he engaged in free speech and association in regards to the political process.

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

In response, Kaelin filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for a failure to state a claim upon which relief can be granted, in addition to raising the defense of qualified immunity. In support of this motion, Kaelin argued that: (1) Cox's pleadings were conclusory and did not meet the necessary pleading standard to survive a motion to dismiss; (2) Cox had not pleaded a policy on which his claim was based; (3) Cox had not pleaded sufficient facts to support a claim of retaliation for engaging in conduct protected by the First Amendment; and (4) Cox's pleadings failed to negate Kaelin's qualified immunity defense. The matter was referred to a United States Magistrate Judge, who found that Cox had pleaded sufficient facts to support all of the required elements of a First Amendment retaliation claim and had pleaded sufficient facts to negate Kaelin's qualified immunity defense at the motion to dismiss **309 stage. The Magistrate Judge further found that the issue of whether there was a practice or policy violative of the First Amendment was not relevant to the cause of action against Kaelin. The Magistrate Judge therefore recommended that Kaelin's motion to dismiss be denied. The district court thereafter overruled all of Kaelin's objections to the Magistrate Judge's recommendation, adopted its findings and conclusions, and denied Kaelin's motion to dismiss. Kaelin then filed a timely notice of appeal.

**DISCUSSION**

**I.**

In his brief, Cox asserts that this Court lacks jurisdiction to review the district court's denial of Kaelin's motion to dismiss, arguing that the district court did not reject Kaelin's defense of qualified immunity, but rather made a "preliminary determination" that Cox had pleaded sufficient facts that, if proven, would negate Kaelin's qualified immunity defense. However, a district court order denying a government official's claim of qualified immunity is immediately appealable under the collateral-order doctrine, provided "it turns on an issue of law." *Ashcroft v. Iqbal,* 556 U.S. 662, 672, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A district court order ruling on the sufficiency of the pleadings on the basis of qualified immunity "turns on an issue of law," as "evaluating the sufficiency of a complaint is not a 'fact-based' question of law." *Id.* at 674, 129 S.Ct. 1937. Therefore, the denial of the motion to dismiss in this case is "an order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding," which gives this Court jurisdiction to review that order pursuant to the collateral-order doctrine. *Id.* at 672, 129 S.Ct. 1937. Our jurisdiction in this case is not limited to reviewing the rejection of the qualified immunity defense; we also have jurisdiction to review whether the pleadings sufficiently state a claim upon which relief can be granted. *Id.* at 673, 129 S.Ct. 1937 (holding that the Court of Appeals had jurisdiction to review the sufficiency of the pleadings because "the sufficiency of respondent's pleadings is both inextricably intertwined with and directly implicated by the qualified immunity defense" (internal quotation marks and citations omitted)).

**II.**

At the outset, Kaelin complains generally that the Magistrate Judge relied on matters outside of the pleadings in denying his motion to dismiss; namely, Kaelin asserts that the Magistrate Judge relied on the pleadings from a separate action against Kaelin. Kaelin argues that this is reversible error without any further elaboration. However, "federal courts are permitted to refer to matters of public record when deciding a 12(b)(6) motion to dismiss," so long as the court does not rely on those matters when deciding the motion. *Davis v. Bayless,* 70 F.3d 367, 372 n. 3 (5th Cir.1995) (citing *Cinel v. Connick,* 15 F.3d 1338, 1343 n. 6 (5th Cir.1994)). If the Magistrate Judge did in

fact rely on pleadings from a separate case, the district court "should have converted the motion to dismiss into a motion for summary judgment, given the parties notice, and then considered all of the evidence presented." *Scanlan v. Tex. A & M Univ.,* 343 F.3d 533, 539 (5th Cir.2003). "Only if it appears that the district court *did* rely on matters outside the pleadings should an appellate court treat the dismissal as a summary judgment." *Fernandez–Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 283 (5th Cir.1993) (emphasis in original). There is nothing in the Magistrate Judge's Memorandum and Recommendation to suggest that the Magistrate Judge placed any reliance **\*310** on facts outside the pleadings, including those alleged by Kaelin, in arriving at his conclusions; all of the Recommendation's findings are fully supported by the pleadings themselves. Further, this Court must give credence to the district court's explicit statement that the Recommendation "is based strictly on the pleadings." *See id.* (citing *Ware v. Associated Milk Producers, Inc.,* 614 F.2d 413, 414–15 (5th Cir.1980)). Therefore, the district court committed no error and the Court will review the denial of the motion to dismiss solely on the basis of the pleadings.

### III.

We review the district court's denial of a motion to dismiss a complaint on the basis of qualified immunity de novo. *Atteberry v. Nocona Gen. Hosp.,* 430 F.3d 245, 252 (5th Cir.2005). "In applying this standard, we accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Id.* (internal quotation marks omitted).

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), "in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d

80 (1957)) (internal quotation marks omitted). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements will not do." *Id.* (internal quotation marks, brackets, and citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679, 129 S.Ct. 1937. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* (internal quotation marks omitted).

In order for a public employee to recover for a free speech retaliation claim, the plaintiff must satisfy four elements: "(1) the plaintiff must suffer an adverse employment decision; (2) the plaintiff's speech must involve a matter of public concern; (3) the plaintiff's interest in commenting on matters of public concern must outweigh the defendant's interest in promoting efficiency; and (4) the plaintiff's speech must have motivated the defendant's actions." *Finch v. Fort Bend Indep. School Dist.,* 333 F.3d 555, 563 (5th Cir.2003).

Cox has pleaded a First Amendment retaliation claim with sufficient facts to render it plausible on its face. It is plausible from the facts Cox alleges that his reassignment to a position in the jail, as well as his discharge, were adverse employment actions. "Adverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands." *Benningfield v. City of* **\*311** *Houston,* 157 F.3d 369, 376 (1998). Cox's alleged

discharge is clearly an adverse employment decision. *Id.* It is also plausible that his reassignment to the jail was an adverse employment decision, as he alleges that Kaelin himself referred to Burnside's reassignment to the jail as a demotion. *See id.* This Court has previously held that transfers to jail duty, even without a decrease in pay, can be adverse employment decisions because "jobs in the jail are not as interesting or prestigious as jobs in the law enforcement section." *Click v. Copeland,* 970 F.2d 106, 110 (5th Cir.1992). We made that finding only after reviewing the evidence presented at trial, and thus we can only make such a finding in this case after further facts have been adduced. However, it is certainly plausible that a position in the jail is less prestigious or interesting than Cox's previous position on a DEA task force. Thus, it is plausible from the facts alleged, including the loss of various benefits, that Cox's reassignment to the jail was indeed an adverse employment decision.

Regarding the second element of a First Amendment retaliation claim, we must determine whether it is plausible from the pleadings that Cox "spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos,* 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). The first step of this inquiry questions whether Cox engaged in First Amendment speech as a citizen or in his role as a public employee. *See Lane v. Franks,* —— U.S. ——, 134 S.Ct. 2369, 2378–80, 189 L.Ed.2d 312 (2014). It is clear that Cox did not participate in the PAC and support for Kaelin's opponent in the course of his ordinary duties as a public employee; on the contrary, Kaelin specifically pleaded that he never discussed his involvement with the PAC or the upcoming election during work hours. Thus, it is clear that Cox engaged in these activities as a citizen. His role as a citizen is impacted neither by the relationship between the PAC—which is an association of sheriff officers—and his employment as a deputy sheriff, nor by the fact that he was supporting the opponent of his superior officer in an upcoming election, as "the critical question ... is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* at 2379.

Next, we must determine whether the speech involved a matter of public concern. *See id.* at 2380. "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id.* (internal quotation marks omitted). "The inquiry turns on the 'content, form, and context' of the speech." *Id.* (quoting *Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). The content—support for Kaelin's opponent—and form—participation in a PAC—of the speech at issue clearly support the notion that it involved matters of public concern, as we have previously held that "there can be no question that ... associating with political organizations and campaigning for a political candidate[ ] related to a matter of public concern." *Vojvodich v. Lopez,* 48 F.3d 879, 885 (5th Cir.1995). The context of the speech, insofar as it occurred in the midst of an upcoming local election, bolsters the conclusion that Cox's speech involved a matter of public concern. Kaelin argues that Cox has not specifically pleaded any facts that suggest he had actually engaged in verbal speech, and that this omission belies any claim that Cox engaged in protected speech. However, we have previously held that political associations qualify **\*312** as speech under the First Amendment, and thus Kaelin's argument is meritless. *See Steadman v. Texas Rangers,* 179 F.3d 360, 367 (5th Cir.1999) (stating that verbal enunciation of political views is not required to receive First Amendment protection; political association is sufficient in itself). Therefore, it is plausible from the facts alleged that Cox engaged in speech in the role of a citizen on matters of public concern.

Kaelin further argues that the district court erred in not conducting a balancing analysis, weighing Cox's interest in commenting on matters of public concern against the defendant's interest in promoting efficiency in the workplace, in order to determine the sufficiency of the pleadings in regards to the third element. Kaelin cites *Kennedy v. Tangipahoa Parish Library,* 224 F.3d 359 (5th Cir.2000), among various other authorities, in support of the proposition that such a balancing inquiry must be made at the motion to dismiss stage of a proceeding. However, *Kennedy* explicitly opposes this assertion, stating, "The

third element, being the factually-sensitive balancing test that it is, implicates only the summary judgment, not failure to state a claim, analysis." *Kennedy v. Tangipahoa Parish Library,* 224 F.3d 359, 366 n. 9 (5th Cir.2000) (abrogated n other grounds by *Twombly,* 550 U.S. at 563, 127 S.Ct. 1955). Therefore, such a balancing inquiry is not warranted at this stage of the proceedings, and it suffices that Cox's pleadings, in which he avers he did not discuss his political affiliations at work, render it plausible that his interest in commenting on matters of public concern outweighed Kaelin's interest in promoting efficiency in the workplace.

Cox has also pleaded sufficient facts to support his claim that his transfer to the jail and subsequent termination were motivated by his political activity. Cox specifically pleads that Kaelin threatened a transfer to the jail should Cox ignore his request to remove Burnside as chairman of the PAC. Cox additionally pleads that Kaelin referenced that previous threat in the phone call during which Kaelin actually transferred Cox to the jail. Additionally, Cox pleads that his support for Kaelin's opponent was "known," and thus it is plausible that his political activity and "known support" for Kaelin's opponent motivated his eventual termination, aside from Cox's further claim that his termination was presumably due to the dissemination of a recording. Kaelin argues that the ten-month lapse of time between Cox's transfer and his termination undermines any claim that his termination was motivated by his political activity. However, Kaelin's argument presupposes that Cox's political activity and support for Kaelin's opponent ceased upon being reassigned to the jail. The pleadings support the inference that Cox's political activity continued following his reassignment, and thus it is plausible that his termination was also motivated by his political activity. Whether Cox's political activity did indeed continue following his transfer is a question better suited for determination at a later stage of the proceedings. Therefore, it is plausible from Cox's pleadings that both his transfer to the jail and subsequent termination were motivated by his political activity.

Accordingly, Cox's complaint "contain[s] sufficient factual matter ... to state a claim to relief that is plausible

on its face," as it is plausible from the complaint that Cox can succeed on all the elements of a First Amendment retaliation claim, and it therefore withstands Kaelin's motion to dismiss. *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937.

## IV.

Regarding Kaelin's claimed defense of qualified immunity, he argues that a **\*313** heightened pleading standard applies when the defense of qualified immunity is asserted, relying on *Schultea v. Wood,* 47 F.3d 1427 (5th Cir.1995). Kaelin's argument, however, misreads this Court's opinion in that case. In *Schultea,* we held that "a plaintiff suing a public official under § 1983 [must] file a short and plain statement of his complaint, a statement that rests on more than conclusions alone." *Schultea v. Wood,* 47 F.3d 1427, 1433 (5th Cir.1995). We further held that a district court "may, in its discretion, insist that a plaintiff file a reply tailored to an answer pleading the defense of qualified immunity." *Id.* at 1433–34. The power to order such a detailed reply is based on the authority of Federal Rule of Civil Procedure 7, and was not derived from the heightened pleading standards espoused in Federal Rule of Civil Procedure 9(b). *Id.* The district court, in its discretion, did not insist that Cox file such a reply, as it found that he had met his burden to negate the defense of qualified immunity because he had alleged sufficient facts in the short and plain statement that *Schultea* initially requires. We review that decision de novo. *Atteberry,* 430 F.3d at 252.

In order to negate the defense of qualified immunity, Cox must plead sufficient facts to make it plausible that Kaelin's conduct: (1) violated a "clearly established federal constitutional right;" and (2) was not "objectively reasonable in light of clearly established law." *Nunez v. Simms,* 341 F.3d 385, 387 (5th Cir.2003). The law is clearly established that a public employee may be neither discharged nor demoted in retaliation for exercising his First Amendment Rights. More specifically, the Supreme

Court has consistently held that governmental officials are forbidden from discharging public employees for their political affiliations. *See Rutan v. Republican Party of Ill.,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Further, we have held that "[t]he law was established clearly enough in this circuit [as far back as] January 1988 that a reasonable officer should have known that if he retaliated against an employee for exercising his First Amendment rights, he could not escape liability by demoting and transferring the employee rather than discharging him." *Click,* 970 F.2d at 111. Kaelin argues, citing *Ashcroft v. al-Kidd,* —— U.S. ——, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011), that these statements of law are impermissibly general and thus do not constitute clearly established law. This argument, wherein Kaelin attempts to equate the fairly specific principle barring the discharge or demotion of public employees for exercising their First Amendment rights with the broad notion "that an unreasonable search or seizure violates the Fourth Amendment," which the Court in *al-Kidd* cited as an overly general proposition, is, at best, baseless. Therefore, it is plausible from the facts alleged that Kaelin violated a clearly established constitutional right and his conduct was objectively unreasonable. Accordingly, on the face of the pleadings, Cox has negated Kaelin's qualified immunity defense for the purposes of this stage of the proceedings.

## CONCLUSION

For the foregoing reasons, the district court's denial of Kaelin's motion to dismiss is AFFIRMED.

### All Citations

577 Fed.Appx. 306

## Footnotes

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

**Tab 3**

780 Fed.Appx. 150
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 5th Cir.
Rules 28.7 and 47.5.
United States Court of Appeals, Fifth Circuit.

Robbie KEETON GEIGER, as Administratrix of
the Estate of Ricky Keith Keeton, Deceased;
Delisha Keeton Mooney; Megan Archer,
Plaintiffs–Appellees,
v.
Deputy Eric SLOAN, Defendant–Appellant.

No. 18-60480
|
FILED August 8, 2019

**Synopsis**
**Background:** Suspected drug dealer's daughters brought §
1983 action against police officer, alleging that officer
violated dealer's Fourth Amendment rights by organizing
a no-knock raid and by using excessive force that resulted
in dealer's death. The United States District Court for the
Northern District of Mississippi, Sharion Aycock, J., 2018
WL 3025951, denied officer's motion for summary
judgment on qualified immunity grounds. Officer
appealed.

**Holdings:** The Court of Appeals held that:

fact issue existed as to whether officer had reasonable
suspicion justifying no-knock raid, and

fact issue existed as to whether officer could have
reasonably perceived dealer to pose a threat of imminent
harm.

Affirmed.

Appeal from the United States District Court for the
Northern District of Mississippi, USDC No. 1:16-CV-95

**Attorneys and Law Firms**

Jim D. Waide, III, Esq., Rachel Pierce Waide, Waide &
Associates, P.A., Tupelo, MS, Richard Shane McLaughlin,
McLaughlin Law Firm, Incorporated, Tupelo, MS, for
Plaintiffs-Appellees

Daniel J. Griffith, Esq., Arnold U. Luciano, Esq., Jacks
Griffith Luciano, P.A., Cleveland, MS, for Defendant-
Appellant

Before CLEMENT, HAYNES, and WILLETT, Circuit
Judges.

**Opinion**

PER CURIAM:[*]

**\*151** This qualified-immunity appeal stems from a drug-
bust SWAT raid gone wrong. An attempted "no knock"
entry led to a firefight in which the suspect died. The
suspect's daughters sued the lead deputy officer, and the
district court denied qualified immunity. We AFFIRM that
denial.

I

Deputy Eric Sloan set up a SWAT raid of suspected drug
dealer Ricky Keeton. Sloan had been surveilling Keeton

for about a year. One night, Sloan and his colleague saw one of their informants leave Keeton's trailer home. They radioed patrol units to stop the informant, and the responding officers found a glass pipe and methamphetamine in the informant's car. The informant told Sloan and his colleague, who arrived on the scene shortly after, that Keeton had a large amount of meth in his trailer as well as $20,000 in cash.

Sloan's colleague prepared an affidavit and search warrant, and Judge Fowlkes signed off on it. Right after, Sloan assembled a SWAT team and briefed them on Keeton's property layout, his camera locations, and his several dogs. After arriving at the trailer, the SWAT team went around back; their plan—to crease the porch door in with a battering ram and pry it open with a crowbar.

As the team was getting ready, Keeton woke up. Telling his girlfriend that he'd heard something outside, Keeton grabbed his pellet gun. The SWAT team then supposedly rammed the door and pried it open. But Keeton's girlfriend says that the deputies never announced who they were and that Keeton opened the door himself.

Deputy Sloan offered two competing reports of what he saw inside the trailer once the door was open: First, in his official statement, he said that a shirtless Keeton fired a black handgun and yelled "you son-of-bitches"; second, in his deposition, Sloan said that he would not have been able to see Keeton unless he'd stepped out onto the porch.

A firefight ensued. It's unclear who shot first. Keeton's girlfriend says that Keeton closed the door and the officers started shooting. In any event, Keeton wound up with 6 bullet wounds and 50 bullet holes in his trailer. Despite first-aid attempts, Keeton died on the scene. The officers recovered nine ounces of meth, but the $20,000 was never found.

## II

Keeton's daughters sued Deputy Sloan as well as the county. They allege that Sloan violated Keeton's Fourth Amendment rights by organizing a no-knock raid and by causing his death.

The district court found that Sloan lacked a reasonable suspicion that knocking and announcing his presence would be dangerous or futile. The district court also found two genuine issues of material fact—the disparity between Sloan's story and Keeton's girlfriend's story; and Sloan's **\*152** own conflicting stories. The court held that these disputes of material fact bear on whether Sloan violated Keeton's Fourth Amendment rights. So it denied him qualified immunity.

## III

The district court had jurisdiction under 28 U.S.C. § 1331. Sloan timely appealed. And this court has jurisdiction to review the denial of qualified immunity to the extent that it's based on legal conclusions.[1] In other words, we review only whether certain conduct would be objectively unreasonable as a matter of law.[2] This court reviews the denial of summary judgment de novo, viewing the facts in the light most favorable to the nonmovant.[3]

## IV

Under Supreme Court precedent, government officials have a right to qualified immunity when carrying out their duties.[4] But under the familiar framework, plaintiffs can overcome it by showing that the officer violated their

clearly established right.[5] Essentially, it's a two-prong test—(1) whether the officer violated a right; and (2) whether that right was clearly established. And as the Supreme Court explained in *Wesby*, "clearly established" means that either "controlling authority" explicitly adopts a rule or else there is a robust consensus of persuasive authority.[6]

The plaintiffs here have asserted two Fourth Amendment claims: one based on the no-knock entry and one based on the use of deadly force. We take them in that order.

A

The plaintiffs successfully alleged a no-knock violation. The Supreme Court established the standard for no-knock entries in its 1997 decision *Richards*.[7] The officers "must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence."[8] And drug investigations don't automatically meet this requirement.[9] Rather, the court must consider the actual circumstances of each particular case.[10] Because controlling authority dictates that officers must have reasonable suspicion, the alleged violation is clearly established.

Moving to the supposed violation, there are three reasons why it isn't clear that Deputy Sloan had reasonable suspicion; and thus why plaintiffs have alleged a constitutional violation.

**\*153** First, the warrant doesn't reveal a reasonable suspicion. There is only one reference in the warrant to "no knock"—a mention that the officer who prepared the affidavit "requests a no-knock search due to officer safety and the protection of further evidence." But the warrant does not go so far as to say that it grants a no-knock entry;

nor does it or the accompanying affidavit explain how the officers announcing their presence would create any danger, futility, or risk of inhibiting the investigation.

Second, the plaintiffs allege that knocking would not have been problematic for the officers. Although Sloan in his deposition said that the informant told his colleague that Keeton had guns, that issue is not properly before us. The district court found it to be undisputed that no one ever questioned the informant about weapons. And thus, under Supreme Court caselaw, we must accept that finding for this interlocutory appeal.[11]

Even if we did have jurisdiction to review this finding, it would not matter. There does appear to be sufficient evidence to create a genuine dispute on this issue. Sloan says that the informant told one officer, who in turn told another officer, who then told Sloan that Keeton had weapons. But in his deposition, the informant said that no one ever asked him about weapons. Nor was this weapon information included in the affidavit or warrant. The plaintiffs also allege that the back-door cameras were disabled. And the plaintiffs allege that officers cut off the sewage line before conducting the raid, mitigating the possibility for evidence destruction. Besides, Sloan in his deposition explained that it was customary for his office to conduct night-time, no-knock raids for drug busts. Thus there are genuine disputes of material fact which bear on whether conducting a no-knock raid violated Keeton's rights. This is not to say that Sloan will not prevail at trial. Instead, the plaintiffs have merely alleged a violation. They still have the burden of refuting the officers' story. In this appeal, the genuineness of factual disputes is not within our jurisdiction.

Third and finally, the independent intermediary doctrine does not apply here. Under that doctrine, "if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party."[12] But here, the plaintiffs don't challenge the warrant; only the no-knock entry. It's disputed whether the warrant authorizes a no-knock entry.

Thus, the district court was correct to deny qualified immunity on this claim.

## B

The plaintiffs have also successfully alleged an excessive-force claim. As the Supreme Court recently explained in *Plumhoff*, by using excessive force, an officer violates the victim's right.[13] Deadly force is excessive unless the officer reasonably believes that a suspect poses a threat of serious harm.[14] So often the question is whether perceiving a threat was reasonable. But that inquiry must be made with **\*154** close attention to the particular facts of the case.[15]

The Supreme Court has explained several times that reasonableness is based on the perspective of an officer on the scene; not clinical hindsight.[16] The officer must "believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."[17] That threat must be imminent. It cannot be a past threat. As this court explained in *Manis*, the focus is on what made the officer shoot.[18] Thus, it's clearly established that when an officer uses deadly force unreasonably, without perceiving an imminent threat, that violates a plaintiff's rights.

But here there are disputes of material fact that bear on whether the officers reasonably perceived a threat of imminent harm. Namely, the district court found that there was a dispute of fact over whether Sloan saw a gun. We cannot question the genuineness of that dispute.[19] First, Keeton's girlfriend's story completely diverges from Sloan's. She says that Keeton opened the door to see the officers on his patio and, out of fear, closed it. Only after then was there any shooting. But Sloan says that the officers battered the door in and only shot when they saw Keeton with a gun. Yet the girlfriend's story contravenes Sloan's story that Keeton came out of the house guns

blazing. In fact, Sloan himself told two conflicting stories: one in which he looked into the trailer and saw Keeton shooting; and one in which he didn't see Keeton. In any event, the girlfriend's story directly refutes the idea that the officers shot because they had a gun pointed at them. And if the girlfriend's story is believed, then Sloan (by his admission) could not have seen a gun. If Sloan did not see a gun, then he could not have reasonably perceived a threat of imminent harm and should not have used deadly force.

Consider, for contrast, the Supreme Court's 2015 decision in *Mullenix*.[20] There, the earlier Fifth Circuit holding denied qualified immunity for an officer who shot a fleeing fugitive.[21] The Supreme Court admonished this court against defining constitutional violations too generally. In other words, courts ought not improperly treat the perception of a threat as a fact question instead of a legal question. Yet in that case, although many facts were in dispute, certain facts the Court found critical were not: that the fugitive claimed to have a gun and was speeding down a highway.[22]

Here, that's not the case. With a disputed story, it's hard to assess whether—as a **\*155** matter of law—Sloan reasonably thought that Keeton posed a threat of imminent harm. The district court was thus right to deny qualified immunity on this basis as well. Because the disputed facts are material to the question of whether a reasonable officer would conclude that Keeton posed a threat of imminent harm, we conclude that summary judgment is inappropriate at this stage.

\* \* \*

The district court correctly denied qualified immunity. AFFIRMED.

## All Citations

780 Fed.Appx. 150

Footnotes

\*       Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent
        except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

1       *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 531 (5th Cir. 1997).

2       *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008).

3       *Plumhoff v. Rickard*, 572 U.S. 765, 768, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014).

4       *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

5       *Id.*; *see also Hogan v. Cunningham*, 722 F.3d 725, 734 (5th Cir. 2013); *Ontiveros v. City of Rosenberg*, 564 F.3d 379,
        382 (5th Cir. 2009).

6       *District of Columbia v. Wesby*, —— U.S. ——, 138 S. Ct. 577, 589, 199 L.Ed.2d 453 (2018).

7       *Richards v. Wisconsin*, 520 U.S. 385, 394–95, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997).

8       *Id.* at 394, 117 S.Ct. 1416.

9       *Id.* at 396, 117 S.Ct. 1416.

10      *See id.*

11      *See Behrens v. Pelletier*, 516 U.S. 299, 312–13, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996).

12      *Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010) (quoting *Taylor v. Gregg*, 36 F.3d 453, 456 (5th Cir. 1994)).

13      *Plumhoff*, 572 U.S. at 774, 134 S.Ct. 2012.

14      *See id.* at 774–75, 134 S.Ct. 2012.

15      *Mullenix v. Luna*, —— U.S. ——, 136 S. Ct. 305, 309, 193 L.Ed.2d 255 (2015).

16      *Plumhoff*, 572 U.S. at 775, 134 S.Ct. 2012; *Los Angeles County v. Rettele*, 550 U.S. 609, 614, 127 S.Ct. 1989, 167 L.Ed.2d 974 (2007); *Graham v. Connor*, 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

17      *Tennessee v. Garner*, 471 U.S. 1, 3, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

18      *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009).

19      *See Behrens*, 516 U.S. at 312–13, 116 S.Ct. 834.

20      *Mullenix*, 136 S. Ct. at 308–12.

21      *Id.* at 307.

22    *See id.* at 310 ("By the time Mullenix fired, Leija had led police on a 25-mile chase at extremely high speeds, was reportedly intoxicated, had twice threatened to shoot officers, and was racing towards an officer's location.... Given Leija's conduct, we cannot say that only someone 'plainly incompetent' or who 'knowingly violate[s] the law' would have perceived a sufficient threat and acted as Mullenix did.").

---

**End of Document**                                      © 2019 Thomson Reuters. No claim to original U.S. Government Works.